IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| LAMESHA RIVARDE-DAVIS, a/k/a LAMESHA RIVARDE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION CASE NO. |
| FARMERS GROUP, INC., | ) ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, Plaintiff Lamesha Rivarde-Davis, a/k/a Lamesha Rivarde, by and through undersigned counsel, and for her Complaint against Defendant Farmers Insurance ("Defendant" or "Farmers"), respectfully states and alleges as follows:

### I.     NATURE OF THE ACTION

1. This is an action for employment discrimination brought to secure legal and equitable relief for injuries that Plaintiff sustained as a result of Defendant's discrimination in violation of The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA").

2. Defendant unlawfully discriminated against Plaintiff on the basis of her disability, creating an intimidating, offensive, and hostile work environment that affected the terms and conditions of Plaintiff's employment.

3. Plaintiff seeks injunctive and declaratory relief, compensatory damages (including back pay and front pay), punitive damages, and reasonable attorneys' fees and costs (including expert witness fees) as remedies for Defendant's violation of her rights.

## II. PARTIES

4. Plaintiff Rivarde-Davis is currently a citizen of Texas. She worked for Farmers from approximately July 2010 until February 2020.

5. Defendant Farmers is a Nevada corporation that does business in all fifty states including Kansas.

6. At all times relevant herein, Defendant had at least fifteen (15) employees and was therefore an "employer" within the meaning of the ADA.

7. Farmers is a corporation and can act only through its officers and employees, and the conduct of an officer or employee acting within the scope of his or her employment or authority is the conduct of the corporation.

8. Farmers is liable for the acts of its officers, employees, and agents.

## III. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over Plaintiff's federal law claims under 28 U.S.C. § 1331, as this case involves questions of federal law.

10. This Court is a proper venue under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Defendant is subject to this Court's personal jurisdiction by maintaining facilities and business operations in this District, and because the events and unlawful employment practices giving rise to this action occurred in this District.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

11. Plaintiff timely filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. § 2000e-5(b), a copy of which is attached hereto as Exhibit 1.

12. On or around March 2, 2021, the EEOC issued Plaintiff a Notice of Right to Sue, a copy of which is attached hereto as <u>Exhibit 2</u>.

13. Plaintiff has complied with all administrative prerequisites to bringing this lawsuit and has timely filed this action.

## V.     FACTUAL BACKGROUND

14. Plaintiff was employed by Farmers from about July 2010 until February 2020. Plaintiff initially worked as a Service Advocate. She earned two career progression promotions during her initial years of employment. From there she was promoted to the position of "Service Consultant" on the Executive Service Team.

15. Plaintiff has been diagnosed with disabilities, which include bipolar disorder, PTSD, depression, and severe anxiety.

16. Because of her disabilities, Plaintiff experiences daily hardships, including trouble sleeping, loss of appetite, difficulties with concentration, and difficulty getting out of bed. Plaintiff experiences mood swings and mania and suffers memory loss during particularly high-stress situations.

17. During all times relevant herein, Plaintiff's disabilities substantially limited one or more of her major life activities, including but not limited to, sleeping, eating, and working.

18. Plaintiff is therefore a disabled person as that term is defined by the ADA.

19. In early 2015, Farmers began experimenting with having employees work from home.

20. Due to her disabilities, Plaintiff volunteered to transition to full-time work from her home office. Plaintiff found that she was able to fulfill all of her job responsibilities at home and that working from home made her disabilities significantly easier to manage.

21. However, immediately after she began working from home, Plaintiff experienced harassment and discrimination as a result of her disabilities and the reasonable accommodations she had requested.

22. In or around April 2015, Plaintiff received a ranking of "2" for her 2014 performance review. A ranking of "2" required that she receive a disciplinary write-up, as well as an action plan for improvement.

23. This ranking did not accurately reflect Plaintiff's job performance during the prior year. She never received any negative observations, nor was she ever advised of any productivity concerns. To the contrary, Plaintiff had received a promotion and several awards in 2014 for exceeding company expectations, which included one of four Choice Awards given in recognition of her outstanding client service and job performance. Only four of Farmers' approximately 1,200 employees were awarded this honor.

24. Nevertheless, Plaintiff's performance review noted that there was "tension regarding [her] approved schedule and schedule conflicts." During this time, she had only taken off time for preapproved PTO and an injury (carpal tunnel) that was determined to be a work-related partial disability.

25. Despite this pretextual explanation, Plaintiff in fact received a relatively poor performance review because of the worsening of her disabilities coupled with an increase in the accommodations she required.

26. Plaintiff successfully had her 2014 ranking overturned after requesting an investigation. Plaintiff's overturned ranking was then reported to her supervisor, Dustin Delich; Mr. Delich's immediate supervisor; and Farmers Human Resources.

27. Yet, Mr. Delich continued to treat Plaintiff differently and subjected her to unfair expectations that were not similarly placed on her non-disabled peers. After Plaintiff brought this issue to the attention of Farmers Human Resources, she was assigned a new supervisor, Nakeita Merritt.

28. Plaintiff ended the year of 2015 with high rankings in all areas and without any negative observations or productivity issues. Throughout the entire year, Plaintiff worked from home and continued to use this reasonable accommodation to better manage her disabilities.

29. Although Plaintiff did not request it, she was transitioned again to a new supervisor, Amber Neale.

30. During this time, the severity of Plaintiff's disabilities significantly worsened, causing her to begin taking intermittent pre-approved short and long-term disability leaves. Plaintiff returned from each disability leave upon being released to work by her doctor.

31. At the end of 2016, Plaintiff received a "successful" ranking during her performance review, which equated to a ranking of "3." While Plaintiff felt that a "3" ranking did not correspond with the excellent reviews and recognition she had received from many Farmers leadership members, she did not appeal the decision (although she did state objections to the review) because she was exhausted from the increased challenges posed by her disabilities as well as the fact that a "3" ranking would not result in any adverse actions being taken against her.

32. Once again, Plaintiff was given a lower ranking than she deserved in 2016 because of an increase in the severity of her disabilities and the corresponding increase in accommodations she required.

33. Plaintiff was then assigned a new supervisor, Kyra Ronchetto, in mid-March 2017 Under Ms. Ronchetto, Plaintiff continued to experience disparate treatment as a result of her disabilities and the accommodations she required.

34. During the first quarter of 2017, Plaintiff exceeded all goals and expectations that had been set for her. Nevertheless, Ms. Ronchetto informed her that her performance had raised "production concerns," even though no production concerns had ever been brought to Plaintiff's attention from January 2017 to May 2017, and even though her productivity statistics exceeded those of her peers.

35. In response to this negative feedback, Plaintiff began tracking her production, confirming that she was consistently meeting her performance goals, and attempting to adapt to Ms. Ronchetto's supervision style.

36. As her disabilities continued to worsen, Plaintiff went on approved medical leave on June 9, 2017. She returned from medical leave in December 2017.

37. When Plaintiff informed Ms. Ronchetto of her plan to return from medical leave and resume working from home, Ms. Ronchetto told her that she would need to come into the office temporarily to ease the transition that corresponded with a recent merger of Farmers' billing executive service team and direct services team, as well as some resulting system updates.

38. When Plaintiff arrived at the Farmers building, Ms. Ronchetto informed her that she would be working full-time in the office for the indefinite future. She did not provide any reason for compelling Plaintiff to return to in-office work indefinitely. Nevertheless, Plaintiff agreed to work in the office at the expense of her mental health.

39. Plaintiff was eventually informed that the decision to deny her the opportunity to continue working from home was driven by alleged production concerns, as reported by Ms. Ronchetto.

40. Once Plaintiff began working in the office permanently, she experienced continued harassment and discrimination from her supervisor, Ms. Ronchetto. This abusive treatment coupled with Plaintiff's worsening disabilities created an increasingly hostile work environment.

41. During this time, Plaintiff's co-workers who did not suffer from disabilities and/or did not require accommodations were given lighter expectations and preferential treatment.

42. In or around the same time, Plaintiff's supervisors required her to meet new requirements and goals applicable only to Plaintiff. She not only met, but exceeded, these new expectations and performance goals.

43. Plaintiff was in constant contact with human resources to request that her reasonable accommodations be reinstated and that she be allowed to work from home as she had done in the past and consistent with her doctor's recommendations. Plaintiff also reported to human resources that she was being treated unfairly and felt that she was being discriminated against because of the disabilities and accommodations she required. No action was taken in response to these complaints.

44. In December 2017, Plaintiff learned that she had received a write-up while on disability leave, by Ms. Ronchetto, which included an action plan for improvement. This write-up was baseless and held Plaintiff to higher standards than her co-workers.

45. In January 2018, Plaintiff received another ranking of "2." In response, she met with Amy Canton of Human Resources to discuss her concerns. While in the meeting, Plaintiff was ambushed by Ms. Ronchetto and her supervisor, Thomas Bertrand. Ms. Ronchetto's presence at the meeting seemed designed to intimidate her. Nevertheless, she presented direct evidence of differential treatment as between herself and her coworkers.

46. The most notable piece of evidence that Plaintiff offered was that she had been assigned to a peer through the Farmers mentorship program. Not only was this peer not meeting company goals, but she continually and flagrantly violated company policies. Plaintiff reported the co-worker to Ms. Ronchetto, who refused to address any of her issues or discipline her. Upon bringing this to light at the January 2018 meeting with Amy Canton, the employee in question was terminated. This proved the merit of Plaintiff's report, while demonstrating at the same time that Ms. Ronchetto ignored termination-worthy behavior from other employees as she continued to harass Plaintiff without any basis whatsoever.

47. Plaintiff attended a follow-up meeting with Human Resources on February 14, 2018. The investigation resulted in the write-up being permanently removed from her file, but the unfair ranking remained when it clearly should not have.

48. On February 15, 2018, Plaintiff attended a meeting with Kelly Corhen from the ethics department and presented her with the record of ongoing harassing and discriminatory incidents she had made.

49. After the February 14, 2018 meeting with Human Resources and the February 15 meeting with the ethics department, Plaintiff believed she had finally demonstrated that she was facing unfair treatment from her employer and that she would be granted a return to reasonable accommodations.

50. In approximately July 2018, however, Plaintiff was transferred to another supervisor, Brenda Stevens, and merged with another department. Despite the stress occasioned by the discrimination, failure to provide reasonable accommodations, and imposition of a rotating door of supervisors (all with different management styles), Plaintiff continued to exceed her production goals and was allowed to transition back to working from home.

51. Plaintiff finally returned to work from her home office full-time in approximately August 2018.

52. Unfortunately, returning to her home office did not protect Plaintiff from further discrimination and harassment. She continued to have to provide daily proof of successful production that exceeded the productivity requirements of her peers who were not subjected to daily harassment.

53. In March 2019, Plaintiff received another unfair performance review, this time for the year 2018. There were no write-ups to justify such a ranking.

54. Plaintiff disproved every claim forming the basis of her 2018 performance review, but no updates were ever made to her ranking. Additionally, most of the comments included in her 2018 performance review were copied and pasted from previous reviews from past supervisors, which were either baseless or had been addressed.

55. Plaintiff raised these concerns to her supervisor, who failed to address them. Plaintiff reached out again to Human Resources regarding her unfair performance review. In retaliation for this complaint, she was written up on March 26, 2019. Plaintiff again disproved the entirety of her write-up, which conflated individual gaps with team gaps, referenced schedule changes or absences that were pre-approved, and indicated that she had been non-responsive to e-mails which she had in fact responded to.

56. Even after refuting the write-up and disproving the facts advanced to support it, the write-up still remained in Plaintiff's file.

57. The increased harassment and discrimination Plaintiff experienced at work continued to exacerbate her disabilities.

58. Plaintiff's doctor recommended that she take a leave of absence from work due to additional stress and additional health issues.

59. Per her doctor's recommendation, on May 31, 2019, Plaintiff called Lincoln Financial and got approved for FMLA leave. In doing so, she gave Lincoln Financial a detailed physician's report. Lincoln Financial has a protocol in place requiring it to send Plaintiff's doctor various forms and requests for information, under the promise of confidentiality. These forms were always filled out timely and properly.

60. During her time on FMLA leave, Plaintiff was simultaneously on approved short-term disability leave.

61. Plaintiff was instructed to channel all communications during her medical leaves through her employer's provider of long-term and short-term disability benefits, which was Lincoln Financial. All communications to Lincoln Financial were relayed to Farmers. Thus, direct correspondence between Plaintiff and Farmers was not necessary, but she nevertheless consistently responded when Farmers reached out for information.

62. On June 13, 2019, Plaintiff received a letter from Lincoln Financial, approving her short-term disability leave through August, which was when her next doctor's appointment was scheduled. Plaintiff's short-term disability leave was then extended until November 28, 2019. On November 28, 2019, her year's allotment of short-term disability expired.

63. At that time, Plaintiff's short-term disability rolled over into long-term disability. Her eligibility for long-term disability was approved on November 6, 2019. On November 14, 2019, Plaintiff learned that Lincoln Financial had assigned her a new Disability Case Manager, Felicia Armstrong.

64. To have continued eligibility for short-term and long-term disability, Plaintiff was required to continuously complete information and questionnaires, and her doctor was required to complete a review and supply an updated medical record. At no time during Plaintiff's leave was there ever an issue with her correspondence or her provision of necessary documents or information to the disability leave team.

65. When her short-term disability rolled over into long-term disability, Plaintiff had a doctor's appointment scheduled for January 10, 2020. This was the earliest appointment she was able to obtain.

66. On December 5, 2019L, Plaintiff spoke with a member of the Leave & Disability Team named Brie. Plaintiff was not provided or does not recall her last name. Plaintiff informed Brie that she was not able to schedule a doctor's appointment earlier than January 10, 2020, and Brie expressly advised this would not be a problem. Plaintiff indicated that she was hopeful she would be able to return to work but could not give a definite answer until after the appointment.

67. Plaintiff also received correspondence dated December 5, 2019 from Farmers' HR Leave & Disability Team. The letter stated:

> We want to check in with you to determine your intentions on returning to work. I encourage you to talk to your physician and determine whether a return to work would be recommended with or without a reasonable accommodation. In the event your physician feels you are able to return to work, enclosed is a Request for Accommodation Assessment that he/she can complete and return to the Leave & Disability Team at usw_accomodation_absence_mgmt@farmersinsurance.com within 2 weeks. This will help Farmers understand what restrictions, if any, you have and will help us identify what options are available. If we do not hear from you within 30 days, we will re-evaluate your employment. Please contact the HR Service Center to discuss with the Leave & Disability Team.

68. On December 10, 2019, Plaintiff spoke with Felicia Armstrong, her long-term disability representative, to ensure that she was fully prepared for her January 10, 2020 doctor's appointment and would be able to answer any questions that Lincoln Financial or Farmers might have.

69. In addition to her phone call with Brie, Plaintiff made three more calls to Farmers HR during the month of December. She called Farmers HR on December 17, 2019, and discussed her expected return, her follow-up appointment, benefits enrollment, and other concerns. She called Farmers HR again on December 20, 2019 and had a similar discussion. At no time during any of these calls did Plaintiff believe that her employment would be placed in jeopardy if she were unable to move her doctor's appointment to January 5, 2020 or earlier.

70. On January 10, 2020, Plaintiff attended her doctor's appointment. She provided an update to Felicia Armstrong, who advised that material would be sent to both Plaintiff and her doctor for completion. At that time, Plaintiff's doctor recommended she continue her long-term disability leave. Plaintiff then scheduled a follow up appointment for reassessment.

71. On the same day, however, Plaintiff received a memo from Farmers dated January 6, 2020. The subject of the memo was "voluntary termination of employment." The memo informed Plaintiff that "[her] employment Farmer Insurance [sic] [would] end on January 6, 2020." The memo did not specifically indicate why her employment had ended or how

her termination could be deemed "voluntary."

72. Plaintiff quickly contacted Farmers HR, which was unable to help and suggested that she e-mail Katie Holly, which she did. In her email, Plaintiff expressed confusion about her employment status and informed her that she was actively on approved long-term disability. After the email, Plaintiff and Ms. Holly had a follow-up phone call, in which Plaintiff advised that Brie had approved the January 10, 2020 doctor's appointment and assured her that her employment would not be adversely affected because of her inability to secure an earlier appointment.

73. After the call, Ms. Holly emailed Plaintiff that Farmers decided to terminate her because she had not complied with the 30-day "requirement" set out in the December 5, 2019 letter. Ms. Holly also informed Plaintiff that on January 6, 2020, the supposed "deadline" to give notice to Farmers, Brenda Stevens had called Plaintiff and left a voicemail informing her of Farmers' intent to terminate her employment.

74. Plaintiff never received a voicemail from Ms. Stevens. If Plaintiff had, she would have returned the call.

75. Plaintiff emailed Ms. Holly to provide the following information:

    a. During her phone call with Brie, Plaintiff advised that she had scheduled a January 10, 2020, appointment, and Brie reassured Plaintiff that this appointment date would not be an issue.

    b. Plaintiff spoke with HR on three occasions between December 5, 2019, and January 6, 2020, and kept them apprised of her appointment date.

    c. Plaintiff was in contact with her Lincoln Financial Leave Consultant throughout this time, contacting her immediately after the January 10, 2020 doctor's appointment to update her.

    d. Plaintiff never received a message from Ms. Stevens advising of her impending termination.

    e. Plaintiff had phone records to confirm all communications.

76. In light of the foregoing, Plaintiff requested that Farmers re-evaluate her "voluntary" termination.

77. Ms. Holly responded to this e-mail on February 6, 2020. Although she did not deny the content of Plaintiff's conversation with Brie, she indicated that Brie did not have the authority to "discuss any of the details of [Plaintiff's] leave status." Ms. Holly also denied that Farmers HR Service Center received any calls from Plaintiff, despite her phone logs to the contrary. Further, Ms. Holly never addressed any of Plaintiff's communications with Lincoln Financial. She simply concluded the e-mail by stating "[t]here is no information to support reversing the Company's decision. This concludes our review."

78. Plaintiff continued to qualify for long-term disability leave until April 30, 2020, when she was informed that Lincoln Financial was closing her claim, effective that day.

79. During the last five years of her employment at Farmers, Plaintiff demonstrated that working from home was a reasonable accommodation for her disabilities. Farmers suggested that working from home was a privilege, but she continued to exceed expectations to maintain that privilege, even in the face of disparate treatment and harassment.

80. When Plaintiff was required to come into work, despite continually exceeding expectations set for both herself and her team, she was deprived of reasonable accommodations for her disabilities. Farmers had already demonstrated that these accommodations were reasonable when they previously allowed her to work from home.

81. Farmers had previously granted Plaintiff reasonable accommodations of eligibility for short and long-term disability leave. During all leaves, Plaintiff maintained consistent communication with both Farmers Human Resources and her disability leave coordinators and returned to work upon receiving her doctor's authorization.

82. By terminating Plaintiff while on long-term disability, Defendant deprived Plaintiff of reasonable accommodations for her disabilities.

83. Plaintiff was also denied reasonable accommodations when Defendant arbitrarily set a 30-day time period for her to update her medical condition and return-to-work plan, then refused to accommodate her inability to schedule a doctor's appointment during that time.

84. Farmers could have reasonably accommodated Plaintiff's disability by allowing some leniency on its 30-day requirement given the fact that she was unable to procure a doctor's appointment during that window, the doctor's appointment she did schedule was only five days after the deadline, and she kept both Farmers HR and her disability leave coordinator apprised of these developments.

85. In addition, Plaintiff thought that Farmers did, in fact, reasonably accommodate her disabilities by relaxing its 30-day requirement, because one of Farmers' HR employees expressly told her that a January 10, 2020 appointment would not be a problem.

86. Farmers did not make a good faith effort to assist Plaintiff in seeking accommodations, and she could have been reasonably accommodated but for the lack of good faith on their part.

87. Plaintiff relied upon Farmers' representations that a later doctor's appointment would not affect her employment.

88. For these reasons, Plaintiff is informed and believes she was treated unjustly and ultimately terminated because she was disabled and she had requested reasonable accommodations for her disabilities.

89. At all times relevant herein, Plaintiff suffered from bipolar disorder, PTSD, severe anxiety, and depression. She has a documented medical history of these disabilities.

90. At all times relevant herein, Plaintiff's disabilities substantially limited one or more of her major life activities because her disabilities hindered or prevented her from sleeping or eating, caused her to experience memory loss and mood swings, and generally complicated every single one of her day-to-day activities.

### VI.     CLAIMS FOR RELIEF

### COUNT I
### Disability Discrimination in Violation of
### The ADA, 42 U.S.C. § 12101 *et seq.*

91. Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

92. Plaintiff is a qualified individual as defined in the ADA in that she was an individual who, with or without reasonable accommodation, could perform the essential functions of her position while employed by Defendant.

93. Defendant is a covered entity and an employer as defined in the ADA in that it is engaged in an industry affecting commerce that has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

94. At all times relevant herein, Plaintiff suffered from bipolar disorder, PTSD, severe anxiety, and depression.

95. Plaintiff's diagnosed conditions constitute a disability as defined in the ADA in that they substantially limited one or more of her major life activities.

96. Plaintiff informed Defendant's personnel of her medical conditions, requested and received accommodations, and took disability leave on multiple occasions.

97. Plaintiff received continuous harassment from her supervisors, both while working from home and in the office.

98. Defendant discriminated against Plaintiff by giving her unfair performance reviews and disciplinary write-ups that had no basis in her actual job performance but were instead motivated by her disabilities and need for reasonable accommodations.

99. Plaintiff's disability was a factor in her discrimination and hostile work environment; all performance issues alleged by Defendant were merely pretext. Defendant terminated Plaintiff because of her disability in violation of the ADA.

100. Defendant's discrimination against Plaintiff affected a term, condition and/or privilege of her employment.

101. Defendant's discriminatory treatment of Plaintiff adversely affected her opportunities and the status of her employment.

102. Defendant utilizes standards, criteria, and/or methods of administration that perpetuate the discrimination of others who are subject to common administrative control.

103. Defendant's discriminatory treatment of Plaintiff based on her disability denied her employment and benefits.

104. As a direct, legal, and proximate result of this discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

105. Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on her disability.

106. Plaintiff is entitled to her reasonable attorneys' fees and costs of suit.

WHEREFORE, Plaintiff prays that this Court grant the following remedies:

    a.      Declare that the aforementioned practices and actions of Defendant constitutes unlawful employment practices in violation of the ADA, 42 U.S.C. § 12101 *et seq.*;

    b.      Award Plaintiff all lost wages, past and future, to which she is entitled;

    c.      Award Plaintiff compensatory damages;

    d.      Award Plaintiff punitive and exemplary damages;

    e.      Award Plaintiff reasonable attorney's fees, costs, and interest;

    f.      Award such other relief as this Court deems just and proper.

## COUNT II
### Failure to Accommodate in Violation of the ADA

107.    Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

108.    Plaintiff is a qualified individual as defined in the ADA in that she was an individual who, with or without reasonable accommodation, could perform the essential functions of her position while employed by Defendant.

109.    Defendant is a covered entity and an employer as defined in the ADA in that it is engaged in an industry affecting commerce that has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

110.    At all times relevant herein, Plaintiff suffered from bipolar disorder, PTSD, severe anxiety, and depression.

111.    Plaintiff's diagnosed conditions constitute a disability as defined in the ADA in that they substantially limited one or more of her major life activities.

112.    Plaintiff was denied reasonable accommodations when, in 2017, she was informed that she would be working full-time in the office for the indefinite future and would not be permitted to continue working from home.

113. Plaintiff was also denied reasonable accommodations when Defendant arbitrarily set a 30-day deadline for her to update her medical condition and return-to-work plan, then refused to accommodate her inability to schedule a doctor's appointment during that time.

114. Finally, Defendant deprived Plaintiff of reasonable accommodations when it terminated her while she was on long-term disability leave.

115. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff has suffered depression, emotional and physical distress, mental and physical anguish, loss of reputations, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

116. As a further direct and proximate result of Defendant's violation of the ADA, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits, and a loss of and impairment of her earning capacity and ability to work, and will so suffer in the future. She has also been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

WHEREFORE, Plaintiff prays that this Court grant the following remedies:

a. Declare that the aforementioned practices and actions of Defendant constitutes unlawful employment practices in violation of the ADA, 42 U.S.C. § 12101 *et seq*.;

b. Award Plaintiff all lost wages, past and future, to which she is entitled;

c. Award Plaintiff compensatory damages;

d. Award Plaintiff punitive and exemplary damages;

e. Award Plaintiff reasonable attorney's fees, costs, and interest;

f. Award such other relief as this Court deems just and proper.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant for economic damages, including, but limited to: back pay, lost benefits, front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre-and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### VII.  PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff hereby requests and demands a trial by jury on all issues so triable.

### VIII.  DESIGNATED PLACE OF TRIAL

Plaintiff hereby designates Kansas City, Kansas as the place of trial in this matter.

Dated: May 30, 2021                                          Respectfully submitted,

|  |  |
|---|---|
|  | MCINNES LAW LLC<br>By: */s/ Jack McInnes*<br>Jack D. McInnes (KS #21898)<br>1900 West 75th Street, Suite 220<br>Prairie Village, Kansas 66208<br>Telephone: (913) 220-2488<br>Facsimile: (913) 347-7333<br>jack@mcinnes-law.com<br><br>ATTORNEYS FOR PLAINTIFF |